No. 03-229

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 262

JAMES R. GREGG, et al.; DOUGLAS L. OLIVER, et al.; MARK
VANNYHUIS, et al.; DAVID R. LAUBER, et al.; KAY DEAN DENNING, et al.,

        Plaintiffs and Appellants,

   v.

THE WHITEFISH CITY COUNCIL and THE
CITY OF WHITEFISH,

        Defendants and Respondents and Cross-Appellants.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                In and for the County of Flathead, Cause Nos. DV-99-037, 99-038, 99-039,
                99-040 and 99-041
                The Honorable Ted O. Lympus, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

        William E. Astle, Astle & Astle, Kalispell, Montana

        For Respondents:

        John M. Phelps, Hedman, Hileman & Lacosta, Whitefish, Montana

              Submitted on Briefs:  October 30, 2003

                      Decided:   September 21, 2004

Filed:

          _____
                          Clerk

Justice John Warner delivered the Opinion of the Court.

¶1     James R. Gregg is one of 277 property owners (Property Owners) who collectively appeals from an order of the Eleventh Judicial District Court, Flathead County, upholding the proceedings of the City of Whitefish (City) to annex their property. The City cross-appeals the District Court's order holding the Property Owners properly sought court review of the annexation proceedings. We affirm.

¶2     We address the following issues:

¶3     1. Did the District Court err in concluding a recorded waiver of protest to annexation executed by a previous landowner is a covenant running with the land that precludes a current landowner from protesting annexation?

¶4     2. Did the District Court err in concluding the City could require consent to annexation for continued receipt of utility services by enacting City of Whitefish Resolution 98-43?

¶5     3. Did the District Court err in concluding that in following City of Whitefish Resolution 98-43, the City could imply consent to annexation from Property Owners who continued to receive utility services after the City gave notice requiring them to disconnect the utilities?

¶6     4. Did the District Court err in concluding the Property Owners could secure judicial review of the City's annexation procedures under § 7-2-4741, MCA, even though a majority did not successfully protest the annexation under § 7-2-4710, MCA?

¶7     5. Did the District Court err in concluding the City met the statutory annexation requirements of Title 7, Chapter 2, Part 47?

2

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶8    During the final four months of 1998, the City took steps to annex six residential areas contiguous to existing City boundaries. In order to stop the annexations, a majority of property owners in each of the areas protested under § 7-2-4710, MCA. However, after the protests were submitted, the City invalidated a number of the protests on certain grounds, two of which are at issue here. First, the City invalidated protests if a previous landowner had waived the right to protest annexation and the waiver was properly recorded with the county clerk and recorder.[1] Second, the City implied consent to annexation and invalidated protests from property owners who failed to arrange to disconnect from the City water and sewer services after notice of such requirement from the City. After discounting protests, the City determined that a majority of property owners failed to protest in five of the areas, while one of the areas successfully protested the annexation. Of the landowners in those five areas, approximately 78% are on City water or sewer or both, and the majority have been on the City's system for at least 37 years. These five areas were then annexed pursuant to City Ordinance No. 98-11. The City also adopted an Extension of Services Plan and addressed the annexation of each area pursuant to statute.

¶9    In January 1999, a majority of the property owners in the five annexed areas filed five separate lawsuits challenging the process of annexation and the sufficiency of the City's Extension of Services Plan. Upon stipulation of the parties, the five cases were consolidated into one. The Property Owners complained in two counts that give rise to this appeal. Count

---

[1] The Property Owners do not contest the City properly invalidated protests from current property owners who signed waiver of protest agreements.

3

I alleged the City improperly invalidated a number of their protests to annexation. Count II alleged the City's annexation Extension of Services Plan failed to meet specific requirements of Title 7, Chapter 2, Part 47. In response, the City asserted, in part, that if a given Property Owner's protest to annexation was invalid, that property owner could not then request judicial review of the City's subsequent annexation proceedings. Therefore, the City asserted that because a majority of Property Owners failed to protest annexation, the majority required for judicial review was not met and the Property Owners had no standing to assert Count II. The parties stipulated to various facts and submitted the issues to the District Court for decision.

¶10 Regarding Count I, the District Court held the City properly invalidated both the protests of landowners whose predecessors in interest had waived the right to protest and the protests of landowners whose consent the City deemed was implied because they did not make plans to disconnect from City water and sewer.

¶11 The court held the right to protest annexation was separate from the right to request judicial review. Therefore, the court held the Property Owners could still request judicial review of the City's compliance with Title 7, Chapter 2, Part 47, as alleged in Count II because a majority of property owners were joined in the suit. Regarding Count II, the District Court reviewed ten separate challenges to the City's annexation procedures and held the City properly met the statutory requirements of each one.

¶12 The court then upheld all five annexations.

¶13 The Property Owners now appeal the rulings invalidating their protests and the rulings upholding the annexations under Title 7. The City cross-appeals the ruling allowing the

4

Property Owners to request judicial review of the statutory annexation requirements. Further facts are discussed below.

## II. STANDARD OF REVIEW

¶14    Section 7-2-4742, MCA, provides for court review of whether statutory annexation procedures were followed and requirements met. To seek the District Court's review under § 7-2-4742, MCA, the parties stipulated to numerous facts and then simultaneously submitted "trial" briefs on the issues and then both submitted "reply" briefs. In those cases reviewing the propriety of municipal actions under § 7-2-4742, MCA, the proper procedure would be for a party to move for summary judgment if that party believes there are no genuine issues of material fact.

¶15    As to our review of whether the City's annexation procedures and plans were in conformity with the law, the parties disagree on the applicable standard of review. The Property Owners assert the District Court and this Court must strictly construe the statutes when reviewing whether an annexation was proper. They cite *Pool v. Town of Townsend* (1920), 58 Mont. 297, 191 P. 385; *Gregory v. City of Forsyth* (1980), 187 Mont. 132, 609 P.2d 248; and *Nilson Enter., Inc. v. City of Great Falls* (1980), 190 Mont. 341, 621 P.2d 466, in support of their strict construction argument. In addition, the Property Owners argue that even though the City is a charter government with self governing powers, the statutory directives of § 7-1-114(1)(a) & (2), MCA, and § 7-2-4742, MCA, limit the City's authority so it must strictly comply with all portions of the annexation statutes.

¶16    The City asserts that because it is a self-governing municipality, it is entitled to a presumption that its actions were proper and reasonable doubts are to be resolved in its favor.

5

Art. XI, Sec. 6, Mont. Const.; § 7-1-106, MCA. In addition, the City cites *State ex rel. Swart v. Molitor* (1981), 190 Mont. 515, 621 P.2d 1100, to argue that although the City must comply with the annexation statutes as indicated by § 7-1-114, MCA, it may act where the statutes are silent. Under *Schanz v. City of Billings* (1979), 182 Mont. 328, 597 P.2d 67, and § 7-2-4743, MCA, the City argues its annexation ordinances, like legislative enactments, are entitled to a presumption of reasonableness. Finally, the City asserts two of the cases cited by the Property Owners, *Gregory* and *Nilson*, do not stand for strict and complete compliance, but instead stand for substantial compliance.

¶17    In *Gregory*, a case in which the City of Forsyth argued the method provided for annexation of territory to a municipality was not exclusive, we stated:

> The general rule is that municipal boundaries may be extended only as prescribed by law. 2 McQuillin, Municipal Corporations § 7.14 at 317 (3rd rev. ed. 1979). Since the jurisdiction of a city to extend its boundaries is a special power, conferred by the legislature, a substantial compliance with all the mandatory requirements of statutory law is essential. McQuillin, supra, § 7.29 at 422; *Pool v. Town of Townsend* (1920), 58 Mont. 297, 304, 191 P. 385, 386.

*Gregory*, 187 Mont. at 135, 609 P.2d at 250. Thus, we concluded the only way to extend municipal boundaries was that provided by statute. The standard requiring substantial compliance with mandatory statutes was established.

¶18    In *Nilson*, the City of Great Falls annexed land without filing either a land description, a certificate of ownership, or an owner's consent to annexation, as specifically required by statute. The *Gregory* standard of substantial compliance was reaffirmed by inserting the above quotation. Then, the Court went on to say:

> Moreover, we reaffirm this Court's decisions in *Pool, Balock* and *Gregory*,

6

supra. When statutory language provides the manner in which a city or town may annex a portion of contiguous property, it must completely and strictly comply with the statute's requirements. Annexation, and the taxation implications that accompany it, should not be approached lightly. The procedure should not be haphazard. Although *Gregory* reaffirmed the rule of substantial compliance, the complete failure to secure the documents necessary to the proper annexation of property is not substantial compliance. The complete disregard of the mandates of what is now section 7-2-4403, MCA, was an error fatal to the City's power to annex.

*Nilson*, 190 Mont. at 347, 621 P.2d at 470. Thus, as the City of Great Falls did not comply at all with the mandatory requirements of the annexation statute, and the owner of the property did not consent to the annexation, it was declared void. In this context, the words "completely and strictly" were added in discussing the standard of substantial compliance with the annexation statutes.

¶19     Both *Gregory* and *Nilson* involved facts where the respective cities did not follow a mandatory statutory procedure at all. Thus, in those cases both of the phrases "substantial compliance" and "completely and strictly comply" were appropriate. In this case the City did comply with each and every one of the statutory mandates as we discuss below. It is the degree of such compliance that is called into question by the Plaintiffs.

¶20     The municipal annexation statutes contain numerous and detailed requirements for a city to annex property. Some of these, especially those concerning plans for the future, charge city planners to make subjective value judgments and statements of opinion. The cardinal considerations for requiring substantial compliance with the annexation laws are public notice and participation, particularly for those affected by a proposed annexation. *Gregory*, 187 Mont. at 136, 609 P.2d at 251. If all of the substantive and procedural requirements of the annexation statutes are included and complied with by a municipality in

7

the annexation procedure, the law will necessarily have been followed. And, in addition, if each of the statutory mandates that contain a subjective component are considered and included in the required plans, i.e., substantially complied with, those citizens whose property is in the annexed area, as well as the residents of the entire city, will have notice and the opportunity to participate. We hold compliance with the annexation statutes must be complete and municipalities must follow all of the directives of the statutes. Compliance must be substantial where a statute requires a municipality to exercise discretion in making its planning decisions. If there are no disputed issues of fact, this Court will review a district court's decision on whether there was compliance with the law *de novo*.

## III. DISCUSSION

## ISSUE ONE

¶21 **Did the District Court err in concluding a recorded waiver of protest to annexation executed by a previous landowner is a covenant running with the land that precludes a current landowner from protesting annexation?**

¶22 Under Montana's statutory scheme for annexation of land adjoining a city, a landowner has the right to protest a proposed annexation. This right is codified at § 7-2-4710, MCA, which reads:

> **Protest**. (1) For a period of 45 days after the public hearing provided for in 7-2-4707 through 7-2-4709, the governing body of the municipality shall accept written comments approving or disapproving the proposed annexation from real property owners of the area proposed to be annexed.
> (2) If a majority of the real property owners disapprove of the proposed annexation in writing, further proceedings under this part relating to the area or any part of the area proposed to be annexed may not be considered or acted upon by the governing body on its own initiative, without petition, for a period of 1 year from the date of disapproval.

At the same time, a municipality may require consent to annexation as a condition of

8

initiating service to a parcel of land.  Section 7-13-4314, MCA, provides:

> **Annexation as a requirement for receiving service**. Any person, firm, or corporation receiving water or sewer service outside of incorporated city limits may be required by the city or town, as a condition to initiate such service, to consent to annexation of the tract of property served by the city or town. The consent to annexation is limited to that tract or parcel or portion of tract or parcel that is clearly and immediately, and not potentially, being serviced by the water or sewer service.

¶23 In 1966, the City adopted a policy requiring that in order to receive City water and sewer utilities a landowner outside City boundaries had to agree to waive their right to protest a later annexation by the City.  The waivers used by the City are entitled either "Consent to Annex Agreement" or "Waiver of Protest Agreement" (collectively referred to as waiver of protest agreements or waivers).  Despite the difference in title, both waiver of protest agreements read as follows:

> That for and in consideration of the sum of One Dollar and other good and valuable consideration ($1.00 o.v.c) to us in hand paid, and certain premises, mutual terms, covenants, provisions, conditions, and agreements, we do hereby waive any and all right to protest which we may have in regard to any attempt made or to be made by the City of Whitefish, Montana, to annex to and make a part of the said City of Whitefish, and incorporate within its boundaries the following described real property situated in the County of Flathead, State of Montana, to-wit: . . .
>
> We do hereby further agree that this covenant shall run to, with, and be binding upon the title of the said real property, and shall be binding upon our heirs, assigns, successors in interest, purchasers, and any and all subsequent holders or owners of the above-described real property.

These waivers were properly recorded after being executed by previous landowners.  The waivers were used by the City to invalidate protests submitted by current Property Owners.  As a result, two of the areas no longer had a majority of property owners protesting annexation and the City annexed those areas.

9

¶24 The District Court concluded the waivers constitute covenants running with the land because the waivers were for the direct benefit of the property itself. The District Court also stated the statutory right of protest is premised on property ownership and that when such right was waived and recorded, it runs with the land. Finally, the District Court noted the consent requirements of § 7-13-4314, MCA, allow a city to extend water and sewer service to a specific tract of land if the owner of the land consents to annexation. The court held that because this statute is also tied to a specific parcel of land based on ownership, the waivers constitute a covenant that runs with the land.

¶25 On appeal, the Property Owners argue the statutory right to protest in § 7-2-4710, MCA, resides with the current landowner and therefore a recorded waiver executed by a previous landowner cannot invalidate a protest to annexation. They argue the statutory consent to annexation authorized by § 7-13-4314, MCA, only applies to the initiation of service and therefore cannot transfer to subsequent purchasers. The Property Owners again cite *Pool, Gregory,* and *Nilson*, to assert that in order for such a waiver to be valid, the Legislature must expressly authorize municipalities to record these waivers by enacting another annexation statute.

¶26 The City argues such waivers are valid and binding on subsequent owners of the property because the waivers were executed by the previous owners to secure a benefit for the land, because the waivers were properly recorded, and because the language of the waivers indicates an intent that subsequent purchasers of the land be bound by the waiver. Finally, the City argues if future purchasers are not bound by the covenants, the entire process of development and subdivision of land would break down and property would have

10

to be annexed one parcel at a time.

¶27   *Molitor* addressed an analogous situation in which a self-governing county enacted an ordinance requiring the payment of a fee to the examining land surveyor. *Molitor*, 190 Mont. at 520-24, 621 P.2d at 1103-05.  The plaintiff asserted that under § 7-1-114, MCA, a self-governing entity must follow the state planning and zoning laws and therefore, the fee was improper because those laws did not expressly provide for such a fee.  We disagreed, holding § 7-1-113, MCA, allows a self-governing entity to act even where there are controlling state laws as long as the local government's actions are not inconsistent with or "lower or less stringent" than state requirements.  We held § 7-1-103, MCA, and § 7-1-106, MCA, both require that we give self-governing powers a broad interpretation.

¶28   The same reasoning applies to this case.  Section 7-1-114(1)(a), MCA, requires the City to comply with the state annexation laws.  Section 7-13-4314, MCA, allows the City to require consent to annexation for supplying its utility service.  The waiver of protest agreements are executed to obtain this consent.  Recording the waivers in order to create covenants that run with the land and bind subsequent purchasers is not inconsistent with or less stringent than the state requirements.  The purpose of § 7-13-4314, MCA, is to ensure that property owners outside a municipality can request utility service and to ensure that a local government can later require annexation in exchange for its utilities.  Creating a covenant that runs with the land furthers these purposes.  The alternative would be to require utilities to be disconnected every time a property changes hands so that the City can again require consent to annexation for its utilities under § 7-13-4314, MCA.  Such a result is not contemplated by the statutory language of § 7-2-4710, MCA, or § 7-13-4314, MCA.

11

¶29 The Property Owners argue there is no statutory authority for such covenants. We disagree. Section 70-17-203, MCA, provides that "Every covenant . . . which is made for the direct benefit of the property or some part of it then in existence, runs with the land." The plain language of this statute indicates the present waivers are allowed as they directly benefit the property. *Hampton v. Lewis & Clark County*, 2001 MT 81, ¶ 25, 305 Mont. 103, ¶ 25, 23 P.3d 908, ¶ 25. Therefore, the waivers are proper because the waivers directly benefit the property and are not inconsistent with or "lower or less stringent" than the state annexation requirements. We note here the Property Owners focused only on their statutory argument that the annexation statutes do not allow for such covenants. They did not argue the waivers do not meet all the necessary elements of a covenant running with the land. Therefore, we need not assess all the elements of covenants running with the land.

¶30 In sum, the District Court properly concluded the waiver of protest agreements recorded by the City constitute covenants that run with the land that comply with the state annexation statutes. These covenants are binding on subsequent purchasers including the Property Owners joined in this case. Therefore, the City properly invalidated protests from these Property Owners and two of the areas annexed by the City did not have a majority of property owners protest the annexation.

## ISSUE TWO

¶31 **Did the District Court err in concluding the City could require consent to annexation for continued receipt of utility services by enacting City of Whitefish Resolution 98-43?**

¶32 A number of tracts in the areas to be annexed have been receiving utility services since before 1966 when the waiver of protest agreements were initiated. In order to address

12

the continuation of services to property that receives water and sewer utilities from the City, the City adopted Resolution 98-43 (the Utility Rule) in September 1998. The Utility Rule provides that upon notice to the property owner, the City can imply consent to annexation if the property owner continues to use the utility services. The rule reads in part as follows:

> The City may, at any time, require a property owner's consent to annexation as a condition of continued sewer and/or water service. When the City determines to require such consent from a particular property owner, the City may notify the property owner, in writing, that the City seeks such consent, and that if such consent is not given, the City will require that the property owner discontinue receiving sewer and water service. . . . If . . . the property owner has not, within ten (10) days, made firm written arrangements to discontinue sewer and water service, then the City shall be entitled to treat the property owner as having consented to annexation of his or her property upon expiration of such 10-day period. . . . If the property owner consents to annexation [by failing to make arrangements to disconnect], then the City shall be entitled to disregard any protest that such property owner makes to a proposed annexation of his or her property.

This rule is based on 46 Op. Att'y Gen. No. 12 (1995) (AG Opinion) which held that municipalities can establish rules requiring consent to annexation for continuing service.

¶33    Pursuant to the Utility Rule, the City gave notice to the affected Property Owners that it would imply their consent to annexation if they failed to make written arrangements to disconnect from the City's utilities. Although numerous Property Owners protested the annexations in writing, few made arrangements to disconnect their utilities. Because they did not make arrangements as required by the Utility Rule, the City invalidated these protests and implied consent to annexation. When these protests were subtracted by the City, none of the five areas had a majority of landowners protest annexation.

¶34    The District Court held that § 7-13-4314, MCA, and the AG Opinion properly supported the City's position that consent to annexation may be required for receipt of

13

continued utility service.

¶35     Analogous to their first argument, the Property Owners assert § 7-13-4314, MCA, does not provide statutory authority for the Utility Rule and that the City cannot by virtue of the rule equate receipt of services to consent to annexation. Further, the Property Owners disagree with the AG Opinion that a municipality can require consent to annexation as a condition of continued receipt of services. The City argues it properly relied on the AG Opinion when it adopted the Utility Rule.

¶36     The District Court is correct. The AG Opinion concludes a municipality "may adopt a rule for the operation of its municipal sewer and/or water utility requiring a property owner's consent to annexation as a condition of continued sewer and/or water service." This conclusion is based on § 69-7-201, MCA, which governs the operation of public municipal utilities. This statute reads:

> **Rules for operation of municipal utility**. Each municipal utility shall adopt, with the concurrence of the municipal governing body, rules for the operation of the utility. The rules shall contain, at a minimum, those requirements of good practice which can be normally expected for the operation of a utility. . . . The rules shall outline the utility's procedure for discontinuance of service and reestablishment of service as well as the extension of service to users within the municipal boundaries and outside the municipal boundaries. The rule shall provide that rate increases for comparable classifications and zones outside the municipal boundaries may not exceed those set within the municipal limits under the provisions of this chapter.

As the Attorney General noted, the provisions of this statute indicate a legislative intent to give municipalities broad authority to adopt rules for the operation of water and sewer utilities.

¶37     Specifically, § 69-7-201, MCA, makes clear a municipality has authority to establish

14

rules regarding users outside its boundaries. Further, the "requirements of good practice which can be normally expected for the operation of a utility" must, by necessity, include rules governing continued use. Therefore, § 69-7-201, MCA, gives a municipality authority to set rules for continued use of its utilities by users outside its boundaries. So, § 7-13-4314, MCA, allows a municipality to require consent to annexation in order to initiate service, and § 69-7-201, MCA, allows a municipality to make rules regarding the discontinuance and reestablishment of service. Therefore, a municipality may require consent to annexation for continued use as well as initial use.

¶38 Rules of statutory construction support this interpretation. We interpret related statutes to harmonize and give effect to each. *Chain v. Mont. DMV*, 2001 MT 224, ¶ 15, 306 Mont. 491, ¶ 15, 36 P.3d 358, ¶ 15. Different language is to be given different construction. *In re Kesl's Estate* (1945), 117 Mont. 377, 386, 161 P.2d 641, 646. Given these rules, the phrase "extension of service" in § 69-7-201, MCA, does not have the same meaning as the word "initiate" in § 7-13-4314, MCA. In addition, we avoid statutory construction that leads to absurd results if a reasonable construction will avoid it. *Chain*, ¶ 15. By allowing a municipality to demand consent to annexation as a requirement of continued service, all parties avoid the duplicative and unnecessary step of discontinuing service if the landowner wishes to continue to receive service and consent to annexation. At the same time, a landowner who does not want to consent to annexation can simply make arrangements to disconnect from service. We affirm the District Court's determination that the City complied with the state annexation statutes when it adopted the Utility Rule in Resolution 98-43 and thereby required consent to annexation as a condition of continued service.

# ISSUE THREE

**¶39    Did the District Court err in concluding that by following City of Whitefish Resolution 98-43, the City could imply consent to annexation from Property Owners who continued to receive utility services after the City gave notice requiring them to disconnect the utilities?**

¶40    Under the Utility Rule set out above, after notice property owners must make "firm written arrangements to discontinue sewer and water service" if they do not wish to consent to annexation. If a property owner fails to do so, "the City shall be entitled to treat the property owner as having consented to annexation." Further, the City is entitled to "disregard any protest" submitted by such a property owner.

¶41    The District Court held that because § 7-13-4314, MCA, does not require a specific type of consent such as express, written or implied, implied consent was a valid form of consent. The court also held implied consent was proper under § 28-2-503, MCA.

¶42    The Property Owners argue there is no statutory authority for implying consent to annexation under the annexation statutes. They also assert that under the contract statute regarding voluntary acceptance of a benefit codified at § 28-2-503, MCA, there can be no meeting of the minds given that the Property Owners submitted written protests. Finally, the Property Owners argue ambiguity and confusion in the City's letters prevented any meeting of the minds that would validate implied consent by the Property Owners. The City argues the implied consent provided for in the Utility Rule is allowed by § 28-2-503, MCA.

¶43    As already decided above, the Utility Rule properly requires consent to annexation for continued service. The rule simply establishes a procedure which puts the burden on the property owner to make written arrangements to disconnect if they wish to express their

16

protest to annexation. Contrary to the Property Owners' argument, there is statutory authority for this approach. Pursuant to § 7-2-4710, MCA, a property owner's consent to annexation is implied if they fail to file written protest. Indeed, a property owner must file written protest under § 7-2-4710, MCA, in order to be counted towards a majority protesting annexation. Section 7-2-4710, MCA, and the Utility Rule simply embody the procedure that once proper notice is given, both action and inaction constitute a decision. Finally, as the District Court noted, nothing in the language of § 7-13-4314, MCA, requires a specific type of consent regarding annexation. Therefore, the Utility Rule's procedure which implies consent from failure to submit written arrangements to disconnect upon notice from the City is acceptable.

¶44 The Property Owners' argument that no meeting of the minds occurred under § 28-2-503, MCA, misses the point. While it is true that implied consent can form a contract under Montana law as indicated by § 28-2-503, MCA, this statute is inapplicable here as the City was not seeking to form a contract with the Property Owners. The City was simply giving the Property Owners notice regarding their options. Indeed, no meeting of the minds was ever to occur and no contract was ever to be formed. Finally, any ambiguities in the letters from the City are irrelevant because no contract was to be formed. The Property Owners do not assert the letters failed to inform them that written arrangements to disconnect were required.

¶45 We conclude the City's procedure to imply consent as allowed in the Utility Rule is a proper method to determine if a property owner wishes to continue receiving City services or, in the alternative, wishes to protest annexation. We affirm the District Court's conclusion

17

the City properly invalidated protests from users who did not make arrangements to disconnect from the City's utilities. Therefore, none of the five areas annexed by the City had a majority of property owners protest the annexation.

## ISSUE FOUR

¶46 **Did the District Court err in concluding the Property Owners could secure judicial review of the City's annexation procedures under § 7-2-4741, MCA, even though a majority did not successfully protest the annexation under § 7-2-4710, MCA?**

¶47 The City argues the Property Owners cannot challenge the remaining annexation proceedings because a majority of property owners did not successfully protest. The District Court disagreed with the City and concluded:

> The right to protest under Section 7-2-4710, M.C.A., and the right for judicial review for failure of the governing body to comply with the statutory procedures and requirements under Section 7-2-4741, M.C.A., are separate and distinct rights. Section 7-2-4710, M.C.A., provides that a majority of the real property owners who validly protest may stop or block annexation. Section 7-2-4741, M.C.A., is available after annexation and allows a majority of the property owners to seek judicial review to force or compel the municipal governing body to comply with statutory procedures. The relief available to [the Property Owners] is controlled by Section 7-2-4742, M.C.A., and appears to be limited to forcing conformance by the governing body. Since the rights are separate and distinct, clearly, failure to exercise the right to protest and a waiver of the right to protest, would not waive any property owner's right to seek judicial review.

¶48 The City asserts the Property Owners subject to a waiver of protest agreement cannot challenge the annexation because they bargained away that right in exchange for city services. The City also argues the Property Owners who were deemed to have consented to annexation under the Utility Rule cannot challenge annexation because they impliedly agreed to accept city services in exchange for their consent.

18

¶49    The City also argues it is unfair to allow a property owner to consent to annexation to receive the City's services and then allow that same person to reverse their position and file suit against the annexation. The City argues if such action is allowed, municipalities will have to annex one property at a time in order to avoid costly litigation. The City asserts there is no societal benefit in making annexation even more difficult than it already is because municipalities still have to comply with Title 7. The City points out after discounting these Property Owners, there is no longer the required majority for judicial review under § 7-2-4741, MCA.

¶50    The Property Owners assert the District Court properly determined the right to request judicial review under § 7-2-4741, MCA, is separate from the right to protest annexation under § 7-2-4710, MCA.

¶51    The right to protest under § 7-2-4710, MCA, is set out above. Section 7-2-4741, MCA, reads:

> **Right to court review when area annexed**. (1) Within 30 days following the passage of an annexation ordinance under authority of this part, either a majority of the real property owners of the area to be annexed or the owners of more than 75% in assessed valuation of the real estate in the area who believe that they will suffer material injury by reason of the failure of the municipal governing body to comply with the procedures set forth in this part or to meet the requirements set forth in 7-2-4734 and 7-2-4735, as applied to their property, may file a petition in the district court of the district in which the municipality is located seeking review of the action of the governing body.

We interpret related statutes to harmonize and give effect to each and to avoid absurd results. *Chain*, ¶ 15. To hold that property owners must meet the protest requirements of § 7-2-4710, MCA, in order to request judicial review under § 7-2-4741, MCA, would fail to give effect to the separate language of § 7-2-4741, MCA. Such a holding would also mean newly

19

annexed citizens of a municipality could not make sure the municipality substantively and procedurally complied with the annexation statutes. Such results are not in accord with the statutes.

¶52 Regarding the waiver of protest agreements, the language clearly indicates the Property Owners waived the right to protest, not the right to request judicial review. The waivers read:

> [W]e do hereby consent to and waive any and all *right to protest* which we may have in regard to any attempt made or to be made by the City of Whitefish, Montana, to annex to and make a part of said City of Whitefish, and incorporate within its boundaries . . . . [Emphasis added].

Protest, as is indicated by § 7-2-4710, MCA, can be made before an annexation occurs. In contrast, the language of § 7-2-4741, MCA, indicates the right to request judicial review is activated after a municipality completes an annexation. Therefore, although the waiver of protest agreements unconditionally waived protest rights, the owners simply made no agreement regarding their right to demand judicial review.

¶53 We disagree with the City's assertion that the obligation of good faith and fair dealing implied in every contract requires the Property Owners to refrain from interfering with annexation in any way. This obligation cannot be so broadly construed as to waive a statutory right to judicial review.

¶54 Regarding the consent implied by continued use under the Utility Rule, as discussed above in ¶ 44, we disagree that any contract regarding annexation was formed. The "offer" to continue service in exchange for consent was not an offer to enter into a contract, but was a means to inform the Property Owner how to register a valid protest. Therefore, these

Property Owners did not waive their right to judicial review.

¶55　The judicial review allowed by § 7-2-4741, MCA, is how residents confirm the City's actions in annexing their homes comply with the law.  We note the City does not dispute the Property Owners met the other requirements of § 7-2-4741, MCA.  Therefore, we affirm the District Court's determination that although the Property Owners did not stop the annexation process under § 7-2-4710, MCA, they properly petitioned to assure the City met statutory annexation requirements of Title 7, Chapter 2, Part 47.

## ISSUE FIVE

¶56　**Did the District Court err in concluding the City met the statutory annexation requirements of Title 7, Chapter 2, Part 47?**

¶57　The Property Owners contend the City's Extension of Services Plan (Plan) specifically violates the requirements of § 7-2-4731(1)(a)(i), MCA; § 7-2-4731(1)(a)(ii), MCA; § 7-2-4731(1)(a)(iii), MCA; § 7-2-4731(1)(b), MCA; § 7-2-4731(1)(c), MCA; § 7-2-4732(1), MCA; § 7-2-4732(2)(b), MCA; § 7-2-4732(2)(c), MCA; § 7-2-4732(3), MCA; § 7-2-4732(4), MCA; and § 7-2-4733, MCA.  The Property Owners' challenge is the same with respect to the five areas to be annexed.  Although we address each statute specifically below, we note, as did the District Court, the Property Owners essentially wish to establish the City may not annex their properties unless the entire City pays for the extension of new water and sewer mains.  As discussed more fully below, because the City has already planned and provided for sufficient water and sewer capacity for the annexed areas, because the City's policy to require private parties to pay for main extensions is allowable under § 76-3-510, MCA, and because the Plan sets forth how new mains can be provided, we hold

21

the City's annexation Plan substantially complies with state statute.

¶58 We address the statutes out of numerical sequence, in order to more clearly present the parties' arguments.

**A. Does the Plan include the statement regarding the extension of municipal services required by § 7-2-4731(1)(c), MCA?**

¶59 Section 7-2-4731(1)(c), MCA, reads:

> **Plans and report on extension of services required.** (1) A municipality exercising authority under this part shall make plans for the extension of services to the area proposed to be annexed and shall, prior to the public hearing provided for in 7-2-4707 through 7-2-4709, prepare a report setting forth its plans to provide services to such area. This report shall include:
> . . . .
> (c) a statement setting forth the plans of the municipality for extending to the area to be annexed each major municipal service performed within the municipality at the time of annexation.

The parties stipulated that the only municipal services at issue are water mains, sewer mains and roads, and that all other municipal services are adequately provided for in the Plan.

¶60 The Plan and the Addendum to the Plan (Addendum) document the extensive water and sewer mains and roads that already exist within the annexed areas. These water and sewer mains already exist in the annexed areas because the City has been extending its municipal services to properties outside its boundaries for over 80 years. Regarding anticipated municipal service needs for those properties within the annexed areas that do not have access to existing mains, the Plan states that construction of any new water or sewer mains will be paid for by the private party desiring the development. This has been the City's policy both within and outside City boundaries since 1977. The Plan also states the City has no plans to extend any new services into the areas to be annexed because the need

22

for any additional water and sewer mains and roads will be initiated and driven by private demand and therefore cannot be predicted by the City. In addition, the Plan notes the City is not aware of any requests for and does not propose any capital improvements over the next five years that would be funded by a Special Improvement District (SID). Finally, the Plan notes that properties within the annexed areas that are currently served by their own wells and septic systems will remain on those systems until upgrades become necessary.

¶61 The parties stipulated the City's water plant and sewer plant capacities are already large enough to serve all properties in the annexed areas. In addition, the parties stipulated:

> It is a reasonable possibility that one or more individual properties within the five annexed areas, as a result of future development of individual property within those annexed areas, developed to densities authorized by present Whitefish zoning, will necessitate the extension of the Whitefish municipal water [and sewer] mains, within five years from the date of the annexation of the five areas.

The parties also stipulated it would cost approximately $2.275 million to extend water and sewer mains to reach every property in all five of the annexed areas.

¶62 In holding the Plan meets the requirements of § 7-2-4731(1)(c), MCA, the District Court concluded:

> [A] substantial number of lots within the five areas to be annexed already receive City water and sewer, or else have private water and septic systems. Those lots which are not currently receiving City water and sewer may connect at any time, and the City water and sewer facilities have adequate capacity to service those additional lots. The City has no plans to extend services in those annexed areas, as the services presently exist or are not being requested.

¶63 The Property Owners assert that because the City stipulated there is a reasonable possibility construction of water or sewer mains will be necessary within the next five years,

the Plan does not comply with § 7-2-4731(1)(c), MCA, when it states the City has no plans for the extension of these services. They argue a statement that present services are sufficient is not enough to meet the statute's requirements. The Property Owners also argue the statute does not exempt its requirement for a plan when part of the area to be annexed already receives municipal services, when part of the area to be annexed is on a private well or septic system, or for when no one is requesting additional service. The Property Owners essentially argue the City must, as a part of its annexation plan, specifically show how water and sewer mains will be extended to all unserved properties within the annexed areas.

¶64 The City argues the Plan conforms to § 7-2-4731(1)(c), MCA, because it states in the Addendum the City has no plans to extend services at this time in each area. The City also asserts the Plan conforms to the statute because the Plan also states that if properties are developed, the mains and streets will only be extended when private parties request and pay for an extension. The City notes its longstanding policy, in accord with § 76-3-510, MCA, that developers and property owners who wish to extend a main are responsible for its cost whether inside or outside City boundaries. The City also points out that because of the existing extensive urban development in the areas to be annexed, water and sewer mains are already in place through or beside much of each area. Regarding roads, the City notes the Plan states the City will assume maintenance of all existing roads in the annexed areas. Finally, the City asserts it cannot predict future extensions because as the Plan states, new mains and roads are initiated by private demand.

¶65 We hold the Plan substantially complies with § 7-2-4731(1)(c), MCA. Even though the City agrees it is reasonable to expect that private landowners in the annexed areas may

24

develop their property so that water or sewer main extensions become necessary in the near future, the statute does not require the City to address each specific property within the annexed area. Rather, the statute requires the City to set forth the City's plans for the extension of municipal services into the area. In this case, the City's plan regarding new water and sewer mains and roads is that the City does not intend to undertake any new construction unless requested and paid for by a landowner. This approach, when considered along with the agreed fact that the City now has adequate water and sewer plants, substantially complies with the statute for a number of reasons.

¶66    First, the City's policy to require private parties to pay for new water and sewer mains and roads is permissible under § 76-3-510, MCA, which allows local governments to require developers to pay for the extension of capital facilities. Given this policy, the City does not initiate development, nor does the City finance development. Rather, such construction is only undertaken when a private property owner decides to request it and pay for it. Although the City can assist in the financing of construction by setting up a SID so local landowners can pay the costs over time, the Plan mentions the City is not currently aware of any requests for a SID.

¶67    Second, to the extent the City can influence the decisions of local landowners within the annexed areas on whether to develop their property such that new main extensions and roads are required, the Plan illustrates the City has already done so. The Plan includes the comprehensive City-County zoning applicable to land within one mile of the City boundary and the planning district applicable to land within four and one-half miles of the City boundary. The Plan also discusses the City's predictions and preferences regarding when

25

and where growth will occur. This discussion addresses each possible development direction north, south, east and west of the City and also discusses the reasons for the existing development.

¶68 Third, because of the extensive development that already exists within the annexed areas in this case, this situation is distinguishable from annexation of a newly proposed subdivision. In the latter situation, the plans for the extension of services into the annexed areas would be coordinated with government approval of the subdivision itself as directed under Title 76.

¶69 Finally, as the parties stipulated, the City already has sufficient water and sewer capacity to serve each property in the newly annexed areas. This stipulation is critical because it indicates the City has in fact already addressed a very expensive component of extending new municipal services into the annexed areas. Therefore, no plan for expanding the City's overall water and sewer capacity is necessary in the Plan.

¶70 In sum, contrary to the Property Owners' argument, § 7-2- 4731(1)(c), MCA, does not require the City to extend services. Rather, it requires the City to set forth its plans as to how new services will be extended to the annexed area so that the public is informed before the hearings required by §§ 7-2-4707-4709, MCA. The City's Plan in this case complies with § 7-2-4731(1)(c), MCA, because it properly sets forth the City's plans for the extension of new water, sewer, and road services.

**B. Does the Plan provide for future development in conformance with § 7-2-4732(2)(b), MCA?**

¶71 Section 7-2-4732(2)(b), MCA, reads:

[The Plan shall] provide for future extension of streets and of major trunk water mains, sewer outfall lines, and other utility services into the area to be annexed, so that when such streets and utility lines become necessary and are constructed, property owners in the area to be annexed will be able to secure such services, according to the policies in effect in such municipality for extending such services to individual lots or subdivisions.

¶72 The District Court held the Plan meets this statute because it sets out the City's policy to extend water and sewer mains only when the property owner pays the cost. The court also noted it would be unfair to current City residents if the City were to change this policy as the policy has always applied within City boundaries.

¶73 The Property Owners again argue the Plan fails to meet the statute. They argue the specific statutory language requires the Plan to provide plans for when future utility lines "become necessary" even if not currently necessary. The Property Owners again point to the stipulation between the parties that it is probable new water and sewer mains will be needed within five years.

¶74 The City argues the Plan complies with the statute because the policy for future extensions is in line with the current policy to require the property owner to pay for the extension. The City also argues because it has water and sewer capacity to serve the annexed areas and a grid of mains beside or through the annexed areas that can be accessed for future development, its Plan complies with the statute.

¶75 We hold the Plan substantially complies with § 7-2- 4732(2)(b), MCA, because it says that future development will have to meet the current "policies in effect" for extension of services and the policy is stated. In other words, the policy for landowners inside and outside the City is that new water mains, sewer mains, and roads will be financed by the

27

property owner requesting the construction.

### C. Does the Plan include a financing method in conformance with § 7-2-4732(3), MCA?

¶76　Section 7-2-4732(3), MCA, reads:

A method must be set forth by which the municipality plans to finance extension of services into the area to be annexed. If the area is serviced currently by adequate water and sewage services, streets, curbs, and gutters and no capital improvements are needed to provide adequate services stipulated by this section and 7-2-4731, the municipality must provide the area to be annexed with a plan of how they plan to finance other services to be included within the district--mainly, police protection, fire protection, garbage collection, street, and street maintenance services, as well as continued utility service.

¶77　The District Court held the Plan meets this requirement because the areas to be annexed are currently serviced by adequate water and sewer lines. The court also held the parties' stipulations indicated no capital improvements were needed.

¶78　The Property Owners argue the Plan fails to meet this requirement because no financing method is set forth and because, contrary to the District Court's holding, capital improvements will be needed in the future to extend water and sewer mains. The Property Owners assert the District Court mischaracterized the stipulations of the parties regarding existing services and ignored the fact that the parties also stipulated there is a reasonable possibility future development will require the extension of water and sewer mains. The Property Owners point out that the City stipulated the cost to extend water to all unserved lots in all five areas would be $966,713 and the cost to extend sewer to all unserved lots would be $1,308,387. The Property Owners also argue the City should not be able to rely on the fact that some of the newly annexed properties have their own septic systems or wells

in order to avoid addressing plans for the extension of services to those properties that will need service in the future.

¶79    The City asserts sufficient financing methods are set forth in the Plan. First, the City points out the Plan provides that new extensions must be paid for by the developer or property owner. The City also notes it is also part of the Plan to provide for "Latecomers Agreements" which allow the City to partially reimburse developers' utility costs from other properties that connect to a new main extension within ten years. The Plan also allows for the formation of SIDs to spread the cost of a main extension over all the benefitting properties. The City argues it now has water and sewer capacity to serve the annexed areas even with new development. This capacity is currently funded by already established taxes and fees as set out in the Plan. Finally, the City asserts the Plan also sets out the current revenue sources for street maintenance.

¶80    We conclude the Plan substantially complies with § 7-2-4732(3), MCA. The Plan sets forth the City's plans for financing methods that sufficiently describe how needed improvements and extensions will be paid for in the annexed areas. Further, we will not disturb the District Court's decision that the annexed areas are "serviced currently by adequate water and sewage services [and] streets" and that no capital improvements are needed to provide the services stipulated by § 7-2- 4732 and -4731, MCA, because the Plan makes clear the City has no plans to extend new services as discussed above.

**D. Does the Plan include tax burden statements and voting methodology statements in conformance with § 7-2-4732(4), MCA, and § 7-2-4733, MCA?**

¶81    Section 7-2-4732(4), MCA, reads:

29

In this annexation plan, it must be clearly stated that the entire municipality tends to share the tax burden for these services, and if so, the area may be annexed without a bond issue under the provisions of this part.

Section 7-2-4733, MCA, reads:

**Vote required on proposed capital improvements.** Included within the plan must be methodology whereby the area to be annexed may vote upon any proposed capital improvements. Should a negative vote be cast by over 50% of the residents in the section or sections to be annexed in such election, the area may not be annexed.

¶82   The District Court held these two provisions must be read together. The court noted the Plan states the entire City will share in the tax burden for the services that will be provided. The court went on to hold that in this instance, because no new capital improvements were proposed in the Plan that would require a bond or a SID, no methodology for a vote was necessary.

¶83   The Property Owners argue the Plan does not comply with these sections. Essentially, the Property Owners argue that because the language of § 7-2-4732(4), MCA, requires a statement that the tax burden for municipal services is shared by the entire community, the City is responsible for paying for new sewer and water main extensions and new roads. As a result, the Property Owners assert the City's policy to require private parties to pay for new main extensions or roads must be void. Further, they argue the language of § 7-2-4732(4), MCA, prevents the City from using a SID to fund development because a SID is paid for only by those properties immediately benefitted by the extended utility mains rather than the "entire municipality." They assert the City is evading the law by not proposing any new capital improvements in order to avoid the statutory requirements.

¶84   In support of their arguments, the Property Owners misquote § 7-2-4732(4), MCA.

30

Their brief states: "The language of § 7-2-4732(4), MCA, requires that the 'entire municipality must share the tax burden for the extension of water and sewer mains.'" This quote is in error because the statute actually reads as set out above.

¶85    The City argues the Plan complies because for each of the areas to be annexed, the Addendum states the entire community tends to share the tax burden. The City asserts § 7-2-4732(4), MCA, allows annexation without a methodology for voting because no bond issue is necessary as no capital improvements were proposed.

¶86    We conclude the City's annexation Plan substantially complies with subsections 7-2-4732(4) and -4733, MCA. The Plan and the Addendum describe various funding sources and methods for financing each of the municipal services. The Plan and Addendum also describe the City's method of financing future extensions of water, sewer, and roads by following the policy that the developer or homeowner pays for the installation when needed. The Addendum also contains the statement for each annexed area: "Nevertheless, the entire community tends to share the tax burden for City services." Further, the Plan states the City has no plans for specific capital improvements related to the annexations.

¶87    These statements in the Plan make it apparent nothing about the annexations requires special or new funding sources. Instead, all municipal services provided to the newly annexed areas, including water capacity, sewer capacity, road maintenance, police and fire protection, storm drainage, garbage disposal, recreation, and other services, will be paid for by the general tax burden shared by the entire community. Any new main extensions or roads must be paid for by the party requiring the new construction. The tax burden for the continuing cost of all municipal services extended under the Plan is to be shared by all City

31

residents. Therefore, the Plan complies with § 7-2-4732(4), MCA, because it sets forth the City's plan for the extension of municipal services such that no special funding sources are required to accomplish the annexations. As a result, no bond issue was necessary to proceed with the annexation as allowed under § 7-2-4732(4), MCA. Further, no voting methodology was required pursuant to § 7-2-4733, MCA, because no capital improvements were proposed by the City.

¶88 We disagree with the Property Owners' argument that § 7-2-4732(4), MCA, requires the City and its current residents "must" pay for new main extensions for annexed residents because of the Plan's statement the entire municipality tends to share the tax burden. As mentioned, the Property Owners misquote § 7-2-4732(4), MCA. "Must" is used in the statute to indicate the Plan must contain the required statement in order to annex without a bond issue. "Must" is not used in the statute to indicate the City is required to pay for new main extensions. Such an interpretation would directly contradict § 76-3-510, MCA.

¶89 Rather, the statute requires a statement the municipality "tends" to share the tax burden for services. "Tends" as used in the statute gives the City latitude to decide to finance new construction for newly annexed areas in accordance with § 76-3-510, MCA, which allows the City to charge individuals for infrastructure needed to specifically benefit their property. Again, we will not interpret § 7-2-4732(4), MCA, in a way that invalidates the plain language of § 76-3-510, MCA. Further, the City's policy to require the party requesting a new main extension to pay for it does not conflict with this statute because, as the parties stipulated, the entire municipality still tends to share the tax burden of the overall water and sewer capacity of the system, which are expensive and continuing components of

32

supplying water and sewer.

¶90    As to the Property Owners' argument that the City is purposefully subverting the statute by not planning capital improvements, this argument fails to recognize the City has acted within its legal authority. Perhaps in hindsight one could argue from a planning perspective the City should not have extended services to properties without annexing them. Or perhaps the City should not annex without forming a SID so that all the newly annexed properties must pay for new main extensions to be installed immediately upon annexation even if such are not currently needed. However, hindsight does not guide our review. We only review whether the City's actions substantially complied with the statute such that its annexation Plan properly informs the public how the extension of services into the annexed areas will be both planned and financed. We hold that it does.

**E. Does the Plan contain a long range plan as required by § 7-2-4732(1), MCA?**

¶91    Section 7-2-4732(1), MCA, reads:

**Contents of plan for extension of services.** (1) Specifically, the plans for the extension of services shall provide a long-range plan for extension of services and the acquisition of properties outside the corporate limits. This plan must show anticipated development a minimum of 5 years into the future, showing on a yearly basis how the municipality plans to extend services, develop and add sections to the city.

¶92    The District Court concluded the City's Plan was in compliance stating:

[The Property Owners' position] flies in the face of present-day city expansion. [Their] position ignores the fact that development and resulting annexation are driven by property owners, not by the cities. Whitefish is no longer "Stumptown," when the City initiated development; now it is the landowner, who, wishing to maximize investment in land, is developing the land and thereafter seeking municipal services. Further, as noted above, the services in the form of water, sewer, and roads already exist in all the areas to

33

be annexed. There is no extension of services which can occur, beyond the individual landowner or developer paying to connect with the existing utilities.

¶93 The Property Owners argue there is no long range plan in the Plan and no statement showing anticipated development five years into the future. They assert the District Court improperly exempted the City from this unambiguous requirement and that the court's holding ignores the statutory directive. The Property Owners also argue that if the statute no longer fits the times, it is up to the Legislature to change it, not the District Court.

¶94 The City asserts the Plan conforms to § 7-2-4732(1), MCA, because it discusses factors likely to influence growth over the next five years by including sections entitled Economic Conditions and Trends, Physical Growth Trends, Impediments to Growth, Growth Stimulants, Prevailing Growth Patterns, and a map of the Projected Growth Area. The City also argues the Plan identifies three contemplated annexations that will occur within five years. Finally, the City argues the District Court correctly noted development and annexations are currently driven by property owners, not cities.

¶95 We hold the City's Plan substantially complies with § 7-2-4732(1), MCA, because it does include careful consideration of future needs. *Inter alia*, the Plan details two additional areas that will likely be annexed within five years. In addition, the part of the Plan discussing growth patterns by direction from the City mentions the City's preferred growth areas and notes where water and sewer mains would be most easily extended to facilitate new growth. This section also mentions that although the City anticipates growth, much of the growth that is expected to occur beyond the limit of current City services will most likely occur after more than five years has passed. The Plan also discusses anticipated growth

34

influences over a period longer than five years. Finally, the Plan makes clear the City, in conformity with a long existing policy, will not extend its services unless such is paid for by the developer. Therefore, again, to the extent the City can make long range plans without knowing the plans of private landowners, the Plan does so.

¶96 The District Court is wrong to the extent its holding implies the City can ignore the statutory mandate because "the times have changed." However, because the Plan itself substantially complies with the statute in this instance, we will affirm.

**F. Does the Plan include a timetable as required by § 7-2-4732(2)(c), MCA?**

¶97 Section 7-2-4732(2)(c), MCA, requires the Plan to set forth a proposed timetable for construction to extend streets, water, sewer, or other utility lines if such extension is "necessary." The District Court held that no timetable was required because no new utility extensions were "necessary." The court noted its agreement with the City that private development determines when extensions will occur and also noted the City has water and sewer capacity to meet the needs of the annexed areas.

¶98 The Property Owners argue a timetable is not in the Plan contrary to the plain language and that because the City acknowledges there will likely be development in the future, the Plan must have a timetable. They assert that even though development will be fueled by private entities, the City has an obligation to predict both the location and timing of this development. They point out the Plan is an informational document for the public that can be changed as predictions change.

¶99 The City asserts a timetable is only required when extensions are "necessary." The

35

City asserts because it has no plans for new water or sewer services or for new roads, extensions are not necessary and therefore a timetable is not necessary. The City argues it cannot predict future development by private parties more than it already has.

¶100 We hold the Plan does comply with § 7-2-4732(2)(c), MCA, because no timetable must be included in the Plan when no extensions are "necessary." Further, as mentioned, to the extent the City can predict or direct the timing of growth, the Plan does so by referring to the City's zoning requirements, by discussing factors influencing growth patterns, and by discussing possible growth directions outside the City.

### G. Does the Plan include maps of the City's present and proposed boundaries in conformance with § 7-2-4731(1)(a)(i), MCA?

¶101 Section 7-2-4731(1)(a)(i), MCA, requires the Plan to include a map or maps showing the present and proposed boundaries of the municipality.

¶102 The Property Owners argue the Plan does not include a map of the present and proposed boundaries because the maps of the proposed boundaries are not in the Plan itself. The City asserts maps of the City are in the Plan and the proposed boundaries are shown on maps in the Addendum which includes a detailed statement for each specific area to be annexed.

¶103 We hold the Plan complies with § 7-2-4731(1)(a)(i), MCA, because the Plan includes maps of the City and because maps with a "proposed annexation boundary" for each annexation area are attached to the Plan in the Addendum so that any member of the public who wishes to know the proposed boundaries can easily determine such by reference to the Addendum.

36

**H. Does the Plan include maps of the present and proposed streets and water mains in conformance with § 7-2-4731(1)(a)(ii), MCA?**

¶104   Section 7-2-4731(1)(a)(ii), MCA, reads the Plan shall include a map of:

the present streets, major trunk water mains, sewer interceptors and outfalls, and other utility lines and the proposed extension of such streets and utility lines as required in subsection (1)(c).

¶105   The Property Owners assert there is no map meeting these requirements.  The City asserts the Addendum maps show the existing streets, water mains, and sewer mains.  The City also argues it did not have to show any proposed streets or utility mains on its maps because it is not proposing any as the areas to be annexed are already fully developed urban areas.

¶106   We hold the Plan complies with § 7-2-4731(1)(a)(ii), MCA, because the maps in the Addendum show the present streets, water mains, and sewer mains for each area to be annexed.  Further, the Plan complies because no new streets or utility mains are proposed as discussed above.

**I. Does the Plan include maps of the general land use in conformance with § 7-2-4731(1)(a)(iii), MCA?**

¶107   Section 7-2-4731(1)(a)(iii), MCA, reads the Plan shall include a map of "the general land use pattern in the areas to be annexed."  The Property Owners argue there is no such map included in the Plan itself and that the District Court erred in relying on the maps in the Whitefish City-County Master Plan (Master Plan).  The City asserts the Plan includes such a map because Exhibit C to the Plan is labeled with zoning codes that correspond to the City-County zoning districts applicable to land within one mile of its boundaries.  The City also asserts the Plan explicitly incorporates the Master Plan by reference in the introduction and

37

by specific references in the Addendum.

¶108   We hold the Plan complies with § 7-2-4731(1)(a)(iii), MCA, because Exhibit C to the Plan shows the "Zoning Use Designations." These designations indicate general land use by showing already applicable zoning as adopted by Flathead County in coordination with the City. Further, while we hold there must be some map showing general land use patterns in the Plan as is done in Exhibit C, we agree with the District Court that the Plan can refer to the Master Plan for more detailed information.

### J. Does the Plan include the statement regarding boundaries required by § 7-2-4731(1)(b), MCA?

¶109   Section 7-2-4731(1)(b), MCA, requires the Plan to include "a statement showing that the area to be annexed meets the requirements of 7-2-4734 and 7-2-4735." Sections 7-2-4734 and -4735, MCA, address, as the District Court noted, "the location of the area to be annexed in relation to the existing city limits" and other boundary requirements. The Property Owners assert the District Court erred because it concluded the Plan complies with § 7-2-4734 and § 7-2-4735, MCA, even if it does not have a specific statement asserting that it complies as is required by § 7-2-4731(1)(b), MCA. The City argues the Addendum has such a statement for each of the areas to be annexed. The City further argues that because § 7-2-4734, MCA, and § 7-2-4735, MCA, contain at least six requirements, it is impossible to state complete compliance in one statement. Finally, the City argues it complied with § 7-2-4734, MCA, and § 7-2-4735, MCA.

¶110   We hold the Plan complies with § 7-2-4731(1)(b), MCA, because the Addendum contains the required statement for each of the annexed areas. Each of the five areas has a

38

statement which reads: "**CONCLUSION** As shown in the preceding text, the area to be annexed meets the requirements of Section 7-2-4734 and Section 7-2-4735 MCA."

## IV. CONCLUSION

¶111   In sum, the District Court correctly determined the City's procedures to invalidate protests based on waiver of protest agreements and based on the Utility Rule are proper. Further, the District Court correctly determined the Property Owners retained their right to request judicial review even though they failed to successfully protest annexation. Finally, the District Court correctly determined the City's Plan conforms with the requirements of Title 7, Chapter 2, part 47. Therefore, the annexations at issue are proper and are effective as provided by statute. We affirm.

/S/ JOHN WARNER

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA O. COTTER
/S/ JIM REGNIER
/S/ JAMES C. NELSON